# EXHIBIT K

EISNERAMPER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASA EXPRESS CORP, as Trustee of
CASA EXPRESS TRUST,

                  Judgment Creditor,

    v.                                                Case No. 1:121-mc-23103-BB

BOLIVARIAN REPUBLIC OF
VENEZUELA, et al.,

                  Judgment Debtor.

_____/

---

**EXPERT REPORT OF NELSON LUIS**

September 10, 2021

---



# EISNERAMPER

# Table of Contents

Part I: Introduction ................................................................................................................... 1

    *Background* .......................................................................................................................... 1

    *Scope and approach limitations* ....................................................................................... 2

    *Qualifications* .................................................................................................................... 3

Part II: Understanding of the Facts ........................................................................................ 4

    *The Judgment* .................................................................................................................... 4

    *FinCEN's Advisory on Public Corruption in Venezuela* .................................................. 5

    *Venezuela's Foreign Currency Exchange* ......................................................................... 5

    *Misappropriation of Venezuelan Funds* .......................................................................... 6

    *Investment of the Misappropriated Venezuelan Funds* ..................................................... 6

Part III: Summary of Opinion ................................................................................................. 8

Part IV: Analysis ...................................................................................................................... 10

    *Methodological asset search* ............................................................................................ 10

Part V: Submission of expert report ....................................................................................... 12

Appendix A: *OFAC's Press Release* ...................................................................................... 13

Appendix B: *Representative list of databases researched* ........................................................ 19

Appendix C: *Information considered* ..................................................................................... 20

Appendix D: *List of Designated Entities to identified real properties assets with current title* ... 21

Exhibit 1: *Curriculum vitae of Nelson Luis* ....................................................... separately attached



EISNERAMPER

## Part I: Introduction

### *Background*

1.      On October 16, 2020, the United States District Court for the Southern District of New York awarded a $43.3 million judgment (the "Judgment" - Case 18 Civ. 11940), in favor of Casa Express Corp., as Trustee of Casa Express Trust ("Casa Express") against the Bolivarian Republic of Venezuela ("Venezuela") for non-payment of two dollar-denominated sovereign bonds. Casa Express beneficially owns a bond issued by the Bolivarian Republic of Venezuela designated ISIN US922646AT10 for a principal amount of $1,845,000 (representing unpaid principal due August 15, 2018) and a second bond issued by the Bolivarian Republic of Venezuela designated ISIN USP9395PAA95 for a principal amount of $27,170,000 (representing unpaid principal due August 15, 2018).[1]

2.      On January 8, 2019, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued a press release formally designating Raul Gorrin Belisario ("Gorrin") and his partner and brother-in-law, Gustavo Perdomo ("Perdomo"), as Specially Designated Nationals and Blocked Persons List for their involvement in an illicit foreign currency exchange scheme, which plundered billions of dollars from Venezuela ("OFAC's Press Release").[2]

3.      According to OFAC's Press Release, 23 entities ("Designated Entities") were cited as owned or controlled by either Gorrin and/or Perdomo. OFAC also indicated that since 2008, the

---

[1]      Federal Superseding Indictment issued against Defendants Raul Gorrin Belisario, Claudia Patricia Diaz Guillen, and Adrian Jose Velasquez Figueroa in the U.S. District Court for the Southern District of Florida dated December 15, 2020.

[2]      Refer to Appendix A for a copy of OFAC's Press Release – "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." *U.S. Department of the Treasury*, January 8, 2019, https://home.treasury.gov/news/press-releases/sm583. Press Release.

# EISNERAMPER

"billions of dollars" generated from the corrupt foreign currency exchange scheme were invested in real estate properties through a network of corporate entities and structures in order to obfuscate the beneficial ownership of the assets.

### *Scope and approach limitations*

4.      Through my firm, Eisner Advisory Group LLC ("EA Group"),[3] I was retained by Casa Express to perform a methodological asset search of seven (7) of 23 Designated Entities as listed in OFAC's Press Release. The scope of this report was to identify and conduct research, through public records, real estate properties associated with the seven (7) selected Designated Entities in an attempt to satisfy the Judgment.

5.      For purposes of this report, we are limiting our scope, analysis and results to those seven (7) Designated Entities owned or controlled by Gorrin that acquired real estate properties in the State of Florida and continue to hold the title to these real properties. I am not providing any opinion with respect to liability of Gorrin or the Designated Entities.

6.      The information in this report is collected from third parties and various secondary information sources available in the public domain including third party websites. The information search is limited to that published on the web, in the public domain in the English language. For the listings/databases available online in the public domain, we referred to the listings/data (available on date of the research) and have presented information accordingly.

---

[3]      EisnerAmper LLP and Eisner Advisory Group LLC practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. EisnerAmper LLP is a licensed independent CPA firm that provides attest services to its clients, and Eisner Advisory Group LLC and its subsidiary entities provide tax and business consulting services to their clients. Eisner Advisory Group LLC and its subsidiary entities are not licensed CPA firms. The entities falling under the EisnerAmper brand are independently owned and are not liable for the services provided by any other entity providing services under the EisnerAmper brand.

# EISNERAMPER

7.     The analysis and opinions expressed in this report are based upon the information and documents identified to date; my education; my training; and my experience. I relied upon and examined available information and performed analyses of such information as I deemed necessary. The documents I have considered in connection with this report are listed in Appendix B.[4]

### *Qualifications*

8.     I, Nelson Luis, MBA, CFE, CFI, CFAA, am currently a Partner in the Forensic, Litigation & Valuation Services ("FLVS") practice at EA Group, a tax and business consulting firm with an office at 1001 Brickell Bay Drive, Miami, Florida 33131. I serve as EA Group's Forensics Mid-Atlantic and Latin America Practice Leader and have extensive global experience advising clients on complex domestic and cross-border forensic and litigation support matters. I assist clients on issues related to disputes, forensic accounting, due diligence efforts around proposed transactions and fraud investigations, including corporate intelligence and matters involving allegations of bribery and corruption, financial reporting irregularities and occupational fraud. Leveraging my experience abroad and fluency in English and Spanish, I have managed 150+ cross-border investigations in Latin America, Asia-Pacific and Africa and have led in-country Foreign Corrupt Practices Act ("FCPA") investigations and compliance assessments in 40+ countries; assisting clients in developing and assessing anti-fraud and anti-corruption compliance programs. I am a Certified Fraud Examiner and a Certified Forensic Interviewer. My education includes a Bachelor of Science degree and Master of Business Administration from the University

---

[4]     Refer to Appendix B for a listing of the information considered.

EISNERAMPER

of Miami and a Certificate in Foundations of Accounting & Auditing from Florida International University's Chapman Graduate School of Business.

9.      A copy of my curriculum vitae, which further details my background, qualifications and experience, is attached as Exhibit 1 to this report.[5]

10.     In connection with this matter, EA Group is being compensated at hourly rates ranging from $175 to $550 (plus certain fixed fees for property record searches, its direct expenses and allocated expenses) based on the level of experience of the EA Group professionals working on this matter. EA Group is compensated at $550 per professional hour for my services in this matter. Such compensation is not contingent on the opinions I express or upon the outcome of this litigation.

**Part II: Understanding of the Facts**

*The Judgment*

11.     The United States District Court for the Southern District of New York awarded a $43.3 million judgment, dated October 16, 2020, in favor of Casa Express against the Bolivarian Republic of Venezuela for non-payment of two dollar-denominated sovereign bonds, which Casa Express beneficially owns (Case 18 Civ. 11940). One bond was issued by the Bolivarian Republic of Venezuela designated ISIN US922646AT10 for a principal amount of $1,845,000 (representing unpaid principal due August 15, 2018). A second bond was issued by the Bolivarian Republic of Venezuela designated ISIN USP9395PAA95 for a principal amount of $27,170,000 (representing unpaid principal due August 15, 2018).

---

[5]      Refer to Exhibit 1 to this report for the curriculum vitae of Nelson Luis.

# EISNERAMPER

12.     As of the date of this report, this Judgment is unsatisfied, due, and owing in its entirety.

### FinCEN's Advisory on Public Corruption in Venezuela

13.     According to the Transparency International's 2020 Corruption Perception Index, Venezuela ranks in 176th place out of 180 countries, demonstrating a high level of corruption and lack of transparency.[6]

14.     According to the former U.S. Secretary of the Treasury Steven T. Mnuchin, "Venezuelan regime insiders have plundered billions of dollars from Venezuela while the Venezuelan people suffer. Treasury is targeting this currency exchange network which was another illicit scheme that the Venezuelan regime had long used to steal from its people."[7] This illicit scheme involved the misappropriation of Venezuelan funds through the conversion of American dollars to Venezuelan bolivars. The Financial Crimes Enforcement Network ("FinCEN") issued an advisory ("Advisory on Widespread Public Corruption in Venezuela"),[8] dated September 20, 2017, to alert financial institutions of widespread public corruption in Venezuela and the methods Venezuelan senior political figures (and their associates and front persons) may use to move and hide corruption proceeds. One of those methods is through the purchase of real estate.

### Venezuela's Foreign Currency Exchange

15.     The Oficina Nacional del Tesoro ("ONT") is the Venezuelan National Treasury, which is responsible for managing the country's public funds and finances.

---

[6]      2020 - CPI - Transparency.org

[7]      "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." *U.S. Department of the Treasury*, January 8, 2019, https://home.treasury.gov/news/press-releases/sm583. Press Release.

[8]      FinCEN Advisory, FIN-2017-A006

**EISNERAMPER**

16.     To meet obligations in bolivars, Venezuela's official currency, the ONT sold Venezuelan bonds from its portfolio that were denominated in U.S. dollars and other foreign currencies.

17.     The Venezuelan National Treasurer would then decide whether the proceeds generated from the bond sales would be exchanged to bolivars at the Venezuelan National Bank or at "casas de bolsa" (brokerage firms) at the Venezuelan National Bank's preferential rate.

18.     The casas de bolsa had access to the parallel "black market" rate, which provided for a much higher exchange rate than the preferential government rate, allowing the exchanges to sell the preferential dollars at the higher rate and retaining massive profits from the spread.

19.     Notably, only ONT-approved casas de bolsa had the ability to conduct bolivar-to-dollar exchanges with the government of Venezuela.

20.     Gorrin controlled one of the few casas de bolsa, which were ONT-approved.

***Misappropriation of Venezuelan Funds***

21.     On January 8, 2019, OFAC formally designated Gorrin and his partner and brother-in-law, Perdomo, as Specially Designated Nationals and Blocked Persons List for their involvement in an illicit foreign currency exchange scheme, which plundered billions of dollars from Venezuela (refer to Appendix A for further details).

***Investment of the Misappropriated Venezuelan Funds***

22.     According to OFAC's Press Release, OFAC indicated that from 2008 to present day, the "billions of dollars" generated from the corrupt foreign currency exchange scheme were invested in properties through a network of corporate entities and structures in order to obfuscate the beneficial ownership of the assets.



# EisnerAmper

23.     Specifically, the following seven (7) entities were designated or blocked by OFAC for being owned or controlled by Gorrin:

| No. | Selected Designated Entity | Description |
|---|---|---|
| 1 | RIM Group Investments Corp. | A Florida entity, which was designated by OFAC because it is owned or controlled by Gorrin, and his wife. |
| 2 | RIM Group Investments I Corp. | A Florida entity, which was designated by OFAC because it is owned or controlled by Gorrin, and his wife. |
| 3 | RIM Group Investments II Corp. | A Florida entity, which was designated by OFAC because it is owned or controlled by Gorrin, and his wife. |
| 4 | RIM Group Investments III Corp. | A Florida entity, which was designated by OFAC because it is owned or controlled by Gorrin, and his wife. |
| 5 | Posh 8 Dynamic Inc. | A Delaware entity, which was designated by OFAC because it is owned or controlled by Gorrin. |
| 6 | Planet 2 Reaching Inc. | A Delaware entity, which was designated by OFAC because it is owned or controlled by Gorrin. |
| 7 | Magus Holding II Corp.[9] | A Florida entity, which was designated by OFAC because it is owned or controlled by Perdomo. |

24.     On August 16, 2018, Gorrin was federally indicted in the Southern District of Florida, and a Superseding Indictment was issued on December 15, 2020, for his participation in the illicit and corrupt foreign currency exchange scheme (Case No. 18-cr-80160). [10]

---

[9]     OFAC incorrectly designated Magus Holding II LLC, which appears to be a non-existing entity according to the Division of Corporations public records. Despite this, any property of Magus Holding II Corp. was blocked as "property and interests in property of [] designated [Perdomo]."

[10]    Federal Superseding Indictment issued against Defendants Raul Gorrin Belisario, Claudia Patricia Diaz Guillen, and Adrian Jose Velasquez Figueroa in the U.S. District Court for the Southern District of Florida dated December 15, 2020.

# EISNERAMPER

25.     The Superseding Indictment lists several "substitute" real properties, "under the provisions of Title 21, United States Code, Section 853 (P)," as "derived from proceeds traceable to [the] offense" including (Case No. 18-cr-80160), including, but not limited to:

| No. | Property Address |
|-----|------------------|
| 1 | 140 Paloma Drive, Coral Gables, Florida 33143 |
| 2 | 144 Isla Dorada Boulevard, Coral Gables, Florida 33143 |
| 3 | 18555 Collins Avenue, Unit 4401, Sunny Isles Beach, Florida 33160 |
| 4 | 4100 Salzedo Street, Unit 1010, Coral Gables, Florida 33146 |
| 5 | 4100 Salzedo Street, Unit 608, Coral Gables, Florida 33146 |
| 6 | 4100 Salzedo Street, Unit 807, Coral Gables, Florida 33146 |
| 7 | 4100 Salzedo Street, Unit 813, Coral Gables, Florida 33146 |
| 8 | 4100 Salzedo Street, Unit 913, Coral Gables, Florida 33146 |

## Part III: Summary of Opinion

26.     Through EA Group's independent investigation and based on our methodology, it is my professional opinion that the Designated Entities did acquire real property in the State of Florida. Properties were acquired since 2008. I was also able to establish that, as of the date of this report, the Designated Entities that are owned or controlled by Gorrin continue to hold the title to these real properties.

27.     Based on information presented by OFAC, starting in 2008, Gorrin was involved in a corrupt foreign currency exchange scheme, where the proceeds of such scheme were invested in real estate, among other assets; Gorrin and others used a network of corporate entities to obfuscate the beneficial ownership of such real estate or other assets; and such corporate entities used by Gorrin and others include the Designated Entities. Relying on OFAC's findings, such properties were acquired using misappropriated Venezuelan funds.



**EISNERAMPER**

28. The following table lists real properties that are owned by the Designated Entities in the State of Florida (collectively hereinafter referred to as the "Florida Real Properties").

| No. | Property Address | OFAC Designated Entities | Legal Description |
|---|---|---|---|
| 1 | 144 Isla Dorada Boulevard, Coral Gables, Florida 33143 | Real property that was purchased on October 21, 2009, by OFAC-designated entity RIM Group Investments III Corp. | Lot 8, Block 20, of COCOPLUM SECTION TWO, Plat E, according to the Plat thereof as recorded in Plat Book 131, Page 76, of the Public Records of Miami-Dade County, Florida. |
| 2 | 18555 Collins Avenue, Unit 4401, Sunny Isles Beach, Florida 33160 | Real property that was purchased on November 29, 2009, by OFAC-designated entity Posh 8 Dynamic Inc. | Unit 4401 of 18555 Collins Avenue Condominium, a Condominium according to the Declaration of Condominium thereof, recorded in Official Records Book 28399, Page 2439, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with its undivided share in the common elements. |
| 3 | 7043 Fisher Island Dr., Unit 7043, Fisher Island, Florida 33109[11] | Real property that was purchased on November 8, 2016, by OFAC-designated entity Planet 2 Reaching Inc. | Unit 7043, PALAZZO DEL SOL / DELLA LUNA AT FISHER ISLAND, A CONDOMINIUM, together with an interest in the limited common elements and common elements appurtenant thereto, according to the Declaration of Condominium for Palazzo del Sol / della Luna at Fisher Island, a Condominium, as recorded on December 30, 2015, in Official Records Book 29908, Page 447, as amended from time to time, of the Public Records of Miami-Dade County, Florida. |
| 4 | 4100 Salzedo Street, Unit 1010, Coral Gables, Florida 33146 | Real property that was purchased on October 29, 2008, by OFAC-designated entity RIM Group Investments Corp. | Condominium Unit No. 1010 of ONE VILLAGE PLACE, A CONDOMINIUM, according to the Declaration of Condominium thereof, recorded in Official Records Book 26306, at Page 2098, of common elements appurtenant thereto. Master Folio Numbers #03-412 0017 0330; 03 412 0017 0340; and 03 412 0017 0380. |
| 5 | 4100 Salzedo Street, Unit 608, Coral Gables, Florida 33146 | Real property that was purchased on December 19, 2014, by OFAC-designated entity RIM Group Investments I, Corp. | Unit No. 608 of ONE VILLAGE PLACE, A CONDOMINIUM, according to the Declaration of Condominium thereof, recorded in Official Records Book 26306, at Page 2098, and all exhibits and amendments thereof, Public Records of Miami-Dade County, Florida. |

---

[11] This property was not listed in Gorrin's Superseding Indictment. Through our independent investigation, we were able to determine that the Designated Entity, Posh 8 Dynamic Inc., acquired this property in 2009.

**EISNERAMPER**

| 6 | 4100 Salzedo Street, Unit 807, Coral Gables, Florida 33146 | Real property that was purchased on April 2, 2010, by OFAC-designated entity RIM Group Investments I, Corp. | Unit No. 807, ONE VILLAGE PLACE, A CONDOMINIUM, according to the Declaration of Condominium thereof, as recorded in Official Records Book 26306, at page 2098, of the Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto. |
| 7 | 4100 Salzedo Street, Unit 813, Coral Gables, Florida 33146 | Real property that was purchased on December 19, 2014, by OFAC-designated RIM Group Investments II Corp. | Unit No. 813, of ONE VILLAGE PLACE, a Condominium, according to The Declaration of Condominium recorded in Official Records Book 26306, at Page 2098, and all exhibits and amendments thereof, Public Records of Miami-Dade County, Florida. |
| 8 | 4100 Salzedo Street, Unit 913, Coral Gables, Florida 33146 | Real property that was purchased on April 2, 2010, by OFAC-designated RIM Group Investments II Corp. | Unit No. 913, ONE VILLAGE PLACE, a Condominium, according to The Declaration of Condominium thereof, as recorded in Official Records Book 26306, at page 2098, of the Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto. |

29.     In addition to the above-listed Florida Real Properties, I discovered that the Designated Entity, Magus Holding II Corp. acquired the real property located at 140 Paloma Drive, Coral Gables, Florida 33143 ("140 Paloma Drive") on October 10, 2011. Despite OFAC's designation and 140 Paloma Drive being the first property listed in Gorrin's Superseding Indictment, Magus Holding II Corp. sold the property on March 12, 2021, for $3.6 million, according to Miami-Dade County public records. Perdomo signed the deed as President of Magus Holding II Corp.

**Part IV: Analysis**

***Methodological asset search***

30.     I, together with my team, conducted a methodological asset search to identify real estate properties associated with seven (7) selected Designated Entities.

31.     First, we conducted asset searches in several open-source databases for each of the Designated Entity names to create an inventory population mapping property records to



# EISNERAMPER

Designated Entities.[12] For instance, my team utilized the database, *LexisNexis® Accurint® for Law Enforcement*, which is an investigative technology that was developed by experienced law enforcement professionals to, among other things, confirm the existence of property to uncover assets during an investigation. These comprehensive databases of public records pull from county property tax assessor databases and are therefore one of the most accurate representation of current property records in the United States.

32.     Once we obtained a list of properties associated with each entity, we determined whether supporting documentation could be pulled online or if an onsite data pull was necessary. In this case, we determined that all supporting documentation could be pulled online.

33.     We then retrieved all publicly available documents relating to the properties identified from the relevant county property tax assessor's office.[13] We obtained the relevant documentation evidencing that title to the Florida Real Properties are being held by the Designated Entities. These documents include the deeds, liens, property tax records and notices of lis pendens.[14]

34.     Finally, we were able to corroborate that the data obtained through our independent investigation was accurate, as the real estate registries displayed the Designated Entities as the title holder of the Florida Real Properties.

---

[12]     Refer to Appendix C for a representative list of databases researched.

[13]     Refer to Appendix D for the list of entities with identified assets.

[14]     The Notices of Lis Pendens are related to the forfeiture count in Gorrin's Superseding Indictment.

**EISNERAMPER**

**Part V: Submission of expert report**

35.      Should additional information, testimony or documents that affect my analysis or opinions become available after the issuance of my report, I may supplement or update my analysis and/or opinions.  Furthermore, I may prepare supplemental materials such as summaries, graphical exhibits or charts, as well as to provide opinions and other materials in response to any additional expert opinions.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated:  September 10, 2021

_____

Nelson Luis
Partner, Eisner Advisory Group LLC





<u>**Appendix A**</u>

*OFAC Press Release*

# Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders

01/08/19

*Action continues to expose endemic corruption at the highest levels of the Venezuelan government as it prepares for Nicolas Maduro's illegitimate inauguration*

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) sanctioned Venezuelan individuals and companies involved in a significant corruption scheme designed to take advantage of the Government of Venezuela's currency exchange practices, **generating more than $2.4 billion in corrupt proceeds**. This designation, pursuant to Executive Order (E.O.) 13850, targets seven individuals, including former Venezuelan National Treasurer Claudia Patricia Diaz Guillen (Diaz) and Raul Antonio Gorrin Belisario (Gorrin), who bribed the Venezuelan Office of the National Treasury (ONT, or Oficina Nacional del Tesoro) in order to conduct illicit foreign exchange operations in Venezuela. In addition to Diaz and Gorrin, OFAC designated or blocked five other individuals and 23 entities, pursuant to E.O. 13850, for their roles in the bribery scheme, and identified one private aircraft as blocked property.

"**Venezuelan regime insiders have plundered billions of dollars from Venezuela while the Venezuelan people suffer**. Treasury is targeting this currency exchange network which was another illicit scheme that the Venezuelan regime had long used to steal from its people," said Secretary of the Treasury Steven T. Mnuchin. "Our actions against this corrupt currency exchange network expose yet another deplorable practice that Venezuela regime insiders have used to benefit themselves at the expense of the Venezuelan people. The United States remains committed to holding accountable those responsible for Venezuela's tragic decline, and will continue to use diplomatic and economic tools to support the Venezuelan people's efforts to restore their democracy."

## THE INNER WORKINGS OF A CORRUPT SYSTEM

Today's designations target individuals who took advantage of a corrupt system within the Venezuelan ONT, stealing billions of dollars from the Venezuelan people since 2008, under the watch of two Venezuelan National Treasurers, Alejandro Jose Andrade Cedeno (Andrade) and Diaz. Andrade was sentenced by the United States District Court for the Southern District of Florida on November 27, 2018, to 10 years in prison for accepting **over $1 billion in bribes** for his role in the below scheme.



EISNERAMPER

The primary responsibility of the ONT is to manage the public finances of the Government of Venezuela using bolivars, the Venezuelan currency. The ONT maintains assets in UK bonds, U.S. dollars, and bolivars, the sum total of which equal the amount that the ONT has available to spend on Venezuelan government operations. When lacking sufficient bolivars for government projects, Andrade used a series of exchange houses, or casas de bolsa, to exchange dollars for bolivars. As part of the scheme, exchange houses sold dollars for bolivars on parallel markets at a higher, black market exchange rate than the official government rate. These exchange houses kept the difference between the black market rate and the official government rate, resulting in massive profits for exchange houses providing bolivars to the ONT. **Only exchange houses approved by the Government of Venezuela, specifically the ONT, had the ability to conduct bolivar-to-dollar exchanges with the Government of Venezuela. As the National Treasurer, Andrade and later Diaz had the authority to decide which exchange houses received government contracts.**

### THE NETWORK THAT RIGGED THE SYSTEM

The below former Government of Venezuela officials and individuals enriched themselves by capitalizing on favorable foreign exchange transactions through casas de bolsa, concealing their profits in European and U.S. bank accounts and investments. **Both Andrade and Diaz, while occupying the role of National Treasurer, used their official positions to give Gorrin, a prominent Venezuelan businessman, access to the ONT's preferred exchange rates to maximize profits on currency transactions moving through the casas de bolsa, which Gorrin, amongst a select few others that were approved by the ONT, controlled. While Andrade was National Treasurer, he awarded the ONT exchange business to a limited number of individuals, including Gorrin and Leonardo Gonzalez Dellan (Gonzalez).**
In return for their selection as the only currency exchange houses approved by the ONT, Gorrin and Gonzalez, another Venezuelan businessman, paid hundreds of millions of dollars in bribes to Andrade. Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT. Gorrin compensated Andrade for introducing him to Diaz, and as a result, allowed the bribery scheme to continue, undeterred. From at least 2011 to 2013, Gorrin paid bribes to Diaz, wiring money to her and her husband, Adrian Jose Velasquez Figueroa (Velasquez), and purchasing assets on their behalf, to include a residence in Cap Cana, Dominican Republic, and an aircraft.

Gorrin and Gonzalez controlled the corrupt wealth that was generated on Andrade's behalf, holding the money in offshore bank accounts and reinvesting in properties, aircraft, and other luxury assets at the direction of Andrade. Andrade's portion of the illicit profits were never sent directly to Andrade; instead these individuals would purchase assets for Andrade, at his direction, or on his behalf. **Gorrin, Gonzalez, and Gorrin's brother-in-law and business partner, Gustavo Adolfo Perdomo Rosales (Perdomo), purchased assets and paid expenses for Andrade related to numerous aircraft and yachts, properties in the United States and abroad, multiple championship horses, and numerous high-end watches. The purchase of all of these goods and wiring of payments was hidden behind a sophisticated network of U.S. and foreign companies that hid the individuals' beneficial ownership.** All individuals involved in the scheme spent their portions of the resulting profits on properties in the United States



EISNERAMPER

as well as through maintaining significant accounts in U.S. banks, and purchasing boats and planes that were registered in the United States. Gorrin later mimicked this structure in controlling Diaz's assets generated as a result of the currency exchange scheme.

The seven individuals designated today have been determined to be responsible for or complicit in, or have directly or indirectly engaged in, any transaction or series of transactions involving deceptive practices and corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela, or are immediate family members of such a person who held properties or owned or controlled companies on that person's behalf. These individuals are listed below:

- **Raul Gorrin Belisario** was indicted by the United States Attorney's Office for the Southern District of Florida in August 2018 for conspiring to violate the Foreign Corrupt Practices Act, and for conspiring to bribe Venezuelan officials and commit money laundering by **hiding embezzled government funds, totaling more than $1 billion, in Florida and New York**. Gorrin was also being investigated for misappropriating billions of dollars from Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. (PDVSA). Gorrin is also thought to have paid several officials to have access to Venezuelan politicians and government officials, and was believed to hold funds on behalf of these individuals in the same way he held funds for Andrade. These individuals include, but are not limited to, Elvis Eduardo Hidrobo Amoroso, who was designated by OFAC on November 9, 2017, and Maikel Jose Moreno Perez, a close friend of Gorrin, who was designated by OFAC on May 18, 2017 pursuant to Executive Order (E.O.) 13692. Gorrin also purchased gifts for Cilia Adela Flores de Maduro, the First Lady of Venezuela, who was designated by OFAC on September 25, 2018 pursuant to E.O. 13692.

- **Claudia Patricia Diaz Guillen** is the former head of the ONT, serving as the National Treasurer between 2011 and 2013. In her role as the National Treasurer, Diaz accepted bribes from Gorrin directly, as well as through her husband, Adrian Jose Velasquez Figueroa (Velasquez), in return for permitting Gorrin to be the one of the select casas de bolsa for the Government of Venezuela. Gorrin held and purchased assets for Diaz and Velasquez in the same way he did for Andrade, to include a property in Cap Cana, Dominican Republic, aircraft, and yachts, obfuscating ownership of these assets through another individual to hide the ultimate ownership by Diaz and Velasquez. She, along with Velasquez, is currently under house arrest in Spain.

- **Adrian Jose Velasquez Figueroa** received bribes from Gorrin on behalf of his wife, Diaz, as part of the scheme to ensure Gorrin's selection as one of the casas de bolsa for the Government of Venezuela. Gorrin held and purchased assets for Diaz and Velasquez in the same way he did for Andrade, to include a property in Cap Cana, Dominican Republic, aircraft, and yachts, obfuscating ownership of these assets through another individual to hide the ultimate ownership by Diaz and Velasquez. He, along with Diaz, is currently under house arrest in Spain.



**EISNERAMPER**

- **Gustavo Adolfo Perdomo Rosales** is the brother-in-law and a business partner of Gorrin.  As Gorrin's business partner, Perdomo — on Gorrin's instruction — made wire transfers and held property on behalf of Andrade.  Additionally, Perdomo beneficially owns an aircraft that Andrade would use, N133JA.

- **Maria Alexandra Perdomo Rosales (Maria Alexandra)** is the wife of Gorrin, and owns or controls, along with Gorrin, several of the companies used to hold property in the United States.

- **Mayela Antonina Tarascio-Perez (Mayela Antonina)** is the wife of Perdomo, and owns or controls, along with Perdomo, a company used to hold property in the United States.

**INVESTMENT OF THE CORRUPT WEALTH**

From the beginning of the scheme in 2008 to present day, the billions of dollars' worth of corrupt proceeds generated through this scheme were invested in domestic and international property, aircraft, yachts, horses, and other luxury goods.  In order to obfuscate the beneficial ownership of these assets, these individuals utilized a network of corporate entities and structures.  The following companies were designated or blocked today for being owned or controlled by the aforementioned individuals, and one aircraft was identified as blocked property.

- **Globovision Tele C.A**. is a television station located in Caracas, Venezuela, and is owned or controlled by Gorrin and Perdomo.

- **Globovision Tele CA, Corp**. is registered in Miami, Florida, and is owned or controlled by Gorrin and Perdomo.

- **Seguros La Vitalicia** is located in Caracas, Venezuela, and is owned or controlled by Gorrin.

- **Corpomedios GV Inversiones, C.A**. is located in Caracas, Venezuela, and is owned or controlled by Gorrin and Perdomo.

- **Corpomedios LLC** is registered in Miami, Florida, and is owned or controlled by Gorrin and Perdomo.

- **RIM Group Investments, Corp**. is registered in Miami, Florida, and is owned or controlled by Gorrin, and his wife, Maria Alexandra.

- **RIM Group Investments I Corp**. is registered in Miami, Florida, and is owned or controlled by Gorrin, and his wife, Maria Alexandra.

**EISNERAMPER**

- **RIM Group Investments II Corp**. is registered in Miami, Florida, and is owned or controlled by Gorrin, and his wife, Maria Alexandra.

- **RIM Group Investments III Corp**. is registered in Miami, Florida, and is owned or controlled by Gorrin, and his wife, Maria Alexandra.

- **RIM Group Properties of New York, Corp**. is registered in New York, New York, and is owned or controlled by Gorrin.

- **RIM Group Properties of New York II Corp**. is registered in New York, New York, and is owned or controlled by Gorrin.

- **Magus Holdings USA, Corp**. is registered in Miami, Florida, and is owned or controlled by Perdomo, and his wife, Mayela Antonina.

- **Magus Holding LLC** is registered in Miami, Florida, and is owned or controlled by Perdomo.

- **Magus Holding II LLC** is registered in Miami, Florida, and is owned or controlled by Perdomo.

- **Tindaya Properties Holding USA Corp**. is registered in New York, New York, and is owned or controlled by Perdomo.

- **Tindaya Properties of New York, Corp**. is registered in New York, New York, and is owned or controlled by Perdomo.

- **Tindaya Properties of New York II Corp**. is registered in New York, New York, and is owned or controlled by Perdomo.

- **Posh 8 Dynamic Inc**. is registered in Delaware, and is owned or controlled by Gorrin.

- **Constello No. 1 Corporation** is registered in Delaware, and is owned or controlled by Perdomo, and his wife, Mayela Antonina.

- **Constello Inc**. is registered in St. Kitts and Nevis, and is owned or controlled by Perdomo, and his wife, Mayela Antonina.



EISNERAMPER

- **Windham Commercial Group Inc**. is registered in Delaware, and is owned or controlled by Gorrin and Perdomo.

- **Planet 2 Reaching Inc**. is registered in Delaware, and is owned or controlled by Gorrin.

- **Potrico Corp**. is registered in Delaware, and is owned or controlled by Perdomo.

- **N133JA** is a Dassault Mystere Falcon 50EX private aircraft that is beneficially owned by Perdomo.

As a result of this action, all property and interests in property of those designated today subject to or transiting U.S. jurisdiction are blocked, and U.S. persons are generally prohibited from engaging in transactions with them.  Concurrent with this action, OFAC is issuing a general license that authorizes certain transactions and activities with two entities owned or controlled by Gorrin and Perdomo, **Globovision Tele C.A.** and **Globovision Tele CA, Corp**, for a one-year period.  This general license is intended to allow the Venezuelan-based Globovision news network to continue operating by authorizing specific activities that would otherwise be prohibited.  The path for the United States to provide permanent sanctions relief to these entities is through divestment and relinquishment of control by any Specially Designated Nationals, including Gorrin and Perdomo.

U.S. sanctions need not be permanent; sanctions are intended to change behavior.  The United States has made it clear that we will consider lifting sanctions for persons designated under E.O. 13692 or E.O. 13850 who take concrete and meaningful actions to restore democratic order, refuse to take part in human rights abuses, speak out against abuses committed by the government, and combat corruption in Venezuela.

For additional information about the methods that Venezuelan senior political figures, their associates, and front persons use to move and hide corrupt proceeds, including how they try to exploit the U.S. financial system and real estate market, please refer to FinCEN's advisories <u>FIN-2017-A006</u>, "Advisory on Widespread Public Corruption in Venezuela," and <u>FIN-2017-A003</u>, "Advisory to Financial Institutions and Real Estate Firms and Professionals."

<u>Source</u>: "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." *U.S. Department of the Treasury*, January 8, 2019, <u>https://home.treasury.gov/news/press-releases/sm583</u>. Press release.



EISNERAMPER

## Appendix B

### *Information considered*

- U.S. Department of Justice, December 16, 2020, Press Release, https://www.justice.gov/opa/pr/former-venezuelan-national-treasurer-and-her-spouse-charged-connection-international-bribery (last accessed, September 7, 2021).

- Federal Superseding Indictment issued against Defendants Raul Gorrin Belisario, Claudia Patricia Diaz Guillen, and Adrian Jose Velasquez Figueroa in the U.S. District Court for the Southern District of Florida dated December 15, 2020.

- "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." *U.S. Department of the Treasury*, January 8, 2019, https://home.treasury.gov/news/press-releases/sm583. Press Release. (last accessed, September 7, 2021).

- U.S. Department of the Treasury OFAC, January 8, 2019, Press Release Chart, https://home.treasury.gov/system/files/126/gorrin_network_chart_20190108.pdf (last accessed, September 7, 2021).

- U.S. Department of Justice, November 20, 2018, Press Release, https://www.justice.gov/opa/pr/venezuelan-billionaire-news-network-owner-former-venezuelan-national-treasurer-and-former (last accessed, September 7, 2021).

- Factual Proffer of Gabriel Arturo Jimenez Aray submitted in the U.S. States District Court for the Southern District of Florida dated March 20, 2018.

- Factual Proffer of Alejandro Cedeño Andrade submitted in the U.S. States District Court for the Southern District of Florida dated December 19, 2017.

- "Advisory on Widespread Public Corruption in Venezuela." *U.S. Department of the Treasury Financial Crimes Enforcement Network (FinCEN)*, September 20, 2017, https://www.fincen.gov/sites/default/files/advisory/2017-09-20/FinCEN%20Advisory%20FIN-2017-A006-508%20Compliant.pdf. Press release, PDF download.

- Judgment Creditor's *Ex Parte* Expedited Motion to Commence Proceedings Supplementary, to Implead Defendants, and For Issuance of Statutory Notices to Appear.

- Documents evidencing that certain OFAC-designated entities hold title to real properties in Florida.

**EISNERAMPER**

## Appendix C

### *Representative list of databases researched*

| No. | Databases |
|-----|-----------|
| 1 | LexisNexis® Accurint® for Law Enforcement |
| 2 | Miami-Dade County, Office of the Property Appraiser Property Search Application |
| 3 | Miami-Dade County, Clerk of the Courts, County Recorder's Official Record Search |
| 4 | NYC, Department of Finance, Automated City Register Information System (ACRIS) |



**EISNERAMPER**

## Appendix D

### *List of Designated Entities to identified real properties assets with current title*

| Selected Designated Entity | Identified assets | Data sources | Deed | Liens | Property tax records | Other |
|---|---|---|---|---|---|---|
| RIM Group Investments III Corp. | 144 Isla Dorada Boulevard, Coral Gables, Florida 33143 | Online | ✓ | ✓ | ✓ | Notice of Lis Pendes RE: Forfeiture |
| Posh 8 Dynamic Inc. | 18555 COLLINS AVE APT 4401, Sunny Isles Beach, Florida 33160 | Online | ✓ | ✓ | ✓ | |
| Planet 2 Reaching Inc. | 7043 Fisher Island Dr Unit 7043 Fisher Island, Florida 33109 | Online | ✓ | ✓ | ✓ | |
| RIM Group Investments Corp. | 4100 SALZEDO ST APT 1010, Coral Gables, Florida 33146 | Online | ✓ | ✓ | ✓ | Notice of Lis Pendes RE: Forfeiture |
| RIM Group Investments I Corp. | 4100 SALZEDO ST APT 608, Coral Gables, Florida 33146 | Online | ✓ | ✗ | ✓ | |
| RIM Group Investments I Corp. | 4100 SALZEDO ST APT 807, Coral Gables, Florida 33146 | Online | ✓ | ✓ | ✓ | Notice of Lis Pendes RE: Forfeiture |
| RIM Group Investments II Corp. | 4100 SALZEDO ST APT 813, Coral Gables, Florida 33146 | Online | ✓ | ✗ | ✓ | Notice of Lis Pendes RE: Forfeiture |
| RIM Group Investments II Corp. | 4100 Salzedo St Apt 913, Coral Gables, Florida 33146 | Online | ✓ | ✓ | ✓ | Notice of Lis Pendes RE: Forfeiture; Release of Lien; |



# **<u>EXHIBIT 1</u>**



## NELSON LUIS
*Partner, Forensics Mid-Atlantic & Latin America Practice Leader*

**D:** 215.881.8878 | **M:** 786.488.2434
NELSON.LUIS@EISNERAMPER.COM

### SPECIALTIES
- Fraud and Forensic Accounting
- Regulatory and Corporate Compliance
- Forensic Due Diligence
- Corporate intelligence
- Litigation Support

### CREDENTIALS/EDUCATION
- Certified Fraud Examiner (CFE)
- Certified Forensic Interviewer (CFI)
- Harvard University: Certificate of Completion Leadership Program
- Chapman Graduate School of Business, Florida International University: Certificate in Foundations of Accounting & Auditing (CFAA)
- University of Miami: MBA, Finance; Strategic Management
- University of Miami: BS, Biology; Chemistry; Business Administration

### AFFILIATIONS
- Association of Latino Professionals For America
- Institute of Internal Auditors
- Association of Certified Fraud Examiners
- International Association for Interviewers
- Risk and Insurance Management Society

### LANGUAGES
- English and Spanish (fluent)

Nelson Luis serves as EisnerAmper's Forensics Mid-Atlantic and Latin America Practice Leader, with extensive global experience advising clients on complex domestic and cross-border forensic and litigation support matters. He assists clients on issues related to disputes, forensic accounting, and fraud investigations, including corporate intelligence and matters involving allegations of bribery and corruption, financial reporting irregularities and occupational fraud.

Leveraging his experience abroad and fluency in English and Spanish, Nelson has expertise in cross-cultural business norms to assist in effectively conducting international internal investigations, cross-border disputes and mitigating compliance risks. He has managed 150+ cross-border investigations in Latin America, Asia-Pacific and Africa. Nelson supports due diligence efforts around proposed transactions, business interruption/fidelity insurance claims, and compliance assessments to recover underreported revenues. He has led in-country Foreign Corrupt Practices Act (FCPA) investigations and compliance assessments in 40+ countries; and assists clients in developing and assessing anti-fraud and anti-corruption compliance programs.

Nelson has served clients as an independent arbitrator and expert. His dispute-related responsibilities include managing the preparation of financial models, economic projections and sensitivity analyses used in the determination of financial damages; supporting on purchase price disputes and working capital adjustments; and preparation of evidentiary materials for trial.

Nelson is a frequent speaker and instructor on diversity, fraud and forensic accounting, forensic interviewing techniques, code of business conduct, and the FCPA. He is the contributing author of "International Investigations: Successful Planning and Execution" – *Litigation Services Handbook, The Role of the Financial Expert* (Fifth Edition). Nelson is actively involved in championing a cultural shift to a more inclusive work environment and is the recipient of the *Philadelphia Business Journal's* Minority Business Leader Award for his efforts related to Diversity and Inclusiveness.

Prior to joining the firm, Nelson was an Equity Principal with a Big 4 accounting firm, where he held several leadership roles during his 16+ year tenure working out of its Philadelphia and Miami offices.

**EISNERAMPER**

Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 2

_Following is a list of representative assignments_

## Lost profits / Breach of contract / Post-close disputes

_Energy – Mining & Metals_

- Served as the independent arbitrator in a multi-million dollar earn-out dispute involving a business leader in providing oil flushing and chemical cleansing services of turbines and industrial equipment. The matter involved assessing certain disagreements relating to Buyer's calculation of the earn-out consideration related to the achievement of certain EBITDA targets during the earn-out periods.

- Served as the independent arbitrator in a cross-border purchase price dispute involving a leading Guatemalan energy company. The matter involved analyzing technical accounting data in multiple languages and ruling on complex IFRS/U.S. GAAP accounting issues. Conference calls, information requests and our Accountants Ruling needed to be moderated and translated into several languages as the clients and counsel were spread across four continents: North America, South America, Europe and Africa. (*)

- Assisted counsel to a leading multinational mining company perform an independent review of certain transactions at its wholly-owned subsidiary in Oslo, Norway. Investigative procedures were performed to rebut Plaintiff's claims of willful breach of contract of a long-standing Marketing and Sales Agreement between the parties. Our team submitted a rebuttal expert report in response to the Claimant's damages expert report, as well as provided expert witness services within an Oslo City Court. (*)

_Financial Services_

- Advised the trustee in a matter issued before the Grand Court of the Cayman Islands related to the solvency review of certain suspect transfers made by an owner of a leading construction and development company in South Florida. We were requested to undertake an analysis of the state of solvency of the suspect and the entities under his management or control. We identified over $60 million in payments that were diverted into a trust despite claims that the suspect was insolvent at the time of the payment transfer dates. (*)

- Assisted counsel to one of Canada's premier financial institutions investigate allegations of a "Shareholders Agreement" breach at their largest Mexican subsidiary. This case (filed in State Court, Supreme Court of New York) involved over 130 Plaintiffs (former/current shareholders) of the financial institution. The Plaintiffs claimed compensatory damages for such breaches in excess of $100 million. Our work involved the estimation/calculation of "recovery" of bad debt and outstanding loans for all of their Mexican operations from customers during the late 90's. (*)

- Assisted counsel of a company which provides security alarm monitoring services, generating an estimated $250 million in annual sales, investigate allegations that the company's third-party collections agency was inappropriately diverting funds collected and intentionally misreporting the results of their collection efforts. The case involved extensive data manipulation and reconciliation of transactional data versus gathered evidence from hundreds of retail customers.

(*) Denotes International Assignment



*Government & Public Sector*

- Served as the seller-side expert in a post-acquisition dispute to a leading government security and technology business in its arbitration. The matter involved drafting the Initial and Rebuttal Submissions, analyzing the disputed items and advising on the settlement negotiations.

- Advised the general counsel of a country's Department of Ministry of Health in its international arbitration against a healthcare project management firm for an alleged breach of contract. The matter involved alleged non-performance of obligations under a contract to provide oncology-related services for the development of this country's first National Oncology Programme and National Oncology Center.  Our team submitted a rebuttal report in response to a damages report prepared by the Claimant's experts, as well as provided expert witness services during the arbitration. (*)

*Media & Entertainment*

- Served as the independent moderator (mandated by a Court Order in Media County, Pennsylvania) in a high net worth divorce proceeding. The parties were majority co-owners of a holding company with an estimated valuation exceeding $150 million. Prior to the holding company's liquidation, we were responsible to: coordinate with external counsel to carry out the terms of the Asset Purchase Agreement, independently monitor its weekly expenditures, perform a valuation analysis of its corporate assets for allocation purposes and monitor the negotiations with the private equity investor purchaser.

- Prepared damages analysis and expert report on behalf of a prominent restaurateur in an action brought against a former employee who started competing restaurants for unfair and deceptive trade practices, misappropriation of trade secrets, unfair competition, trademark infringement, false advertising, and other violations of the Lanham Act. Calculated $20 million of current and future economic damages suffered by Plaintiffs. Plaintiffs' economic damages consisted of Plaintiffs' lost profits but-for Defendants' harmful acts, Defendants' profits, and prejudgment interest.

*Professional Firms & Services*

- *Audit Malpractice* – Advised counsel to a top accounting firm in a high-profile audit malpractice defense case that lasted over five years (assisted with 1st trial proceedings, appeals process, and re-trial proceedings). The financial institution's civil lawsuit claimed that our client was negligent in failing to detect a fraud and sought compensatory and consequential damages in the amount of $170 million, which according to court filings was one of Florida's biggest bank frauds ever. The engagement involved the review of several criminal trial transcripts, audit workpaper documentation, and the creation of a database to summarize key occurrences where evidence was doctored and concealed. Mr. Luis specifically assisted prepare our expert witness for both deposition and trial testimonies, as well as managing the document production phase to ensure full compliance with the issued subpoena.

*Real Estate & Construction*

- Assisted counsel in the negotiations of a matter involving a shareholder's claim that their minority interest had been wrongfully diluted through "bogus" debt capitalization maneuvers while the development's

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 4

profits were only disbursed to its shareholder's to cover their individual tax liability. The engagement team's objective was to identify, review, and categorize the company's cash receipts and disbursements in order to determine whether the corporation's majority owners were operating the corporation in the best interests of all the shareholders.

- Assisted counsel to a leading Philadelphia real estate investment and development company gather evidence for a fraud suit against a construction company. Our team performed a closeout assessment into the project costs by analyzing project contracts, change orders, labor rates, labor costs, material costs and indirect costs. Our team also investigated the anomalies identified during the analysis of the payment applications and corresponding supporting documentation.

*Retail & Consumer Products*

- Served as the seller-side expert in a post-close Purchase Price Adjustment dispute related to a $130 million acquisition to a leading consumer product manufacturing company. The matter involved analyzing the disputed items, submitting an Expert and Rebuttal Expert Report, providing deposition testimonies and testifying during the arbitration hearing.

*Technology*

- Participated in a purchase price dispute related to the acquisition of a large technology firm that designed, developed, and manufactured open-standard memory solutions based on Flash memory and DRAM technologies. This engagement involved the analysis of net working capital settlements and historical accounting policies (incl. accounts receivable policies, technological obsolescence and inventory valuation). As the expert representing the Seller, our team prepared the Initial and Rebuttal Submissions to the Arbitrator that led to a successful outcome.

- Assisted in-house counsel to an international telecommunications equipment provider perform a post-closing purchase price dispute investigation of an asset in the People's Republic of China. Led a cross-border investigative team trace cash flows among the newly acquired subsidiaries, understand the contract flows and perform background checks on the local management team to identify potential conflict of interest issues. (*)

- Assisted counsel to one of the world's largest mobile phones distributors in connection with a $21 million post-acquisition damages dispute. The matter involved alleged non-performance of obligations under a Stock Purchase Agreement (SPA) and Operating Agreement during a joint venture between our client (*i.e.,* the Purchaser) and a Seller based in Mexico City, Mexico. The matter involved the preparation of an expert report and quantification of damages bifurcated as follows: (i) company's lost investment stemming from a fraudulent inducement claim (case filed in the U.S. District Court, Southern District of Florida); (ii) financial statement inaccuracies that were not appropriately accounted for by the Seller pursuant to the indemnification provisions of the SPA (AAA proceeding). (*)

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 5

## Fraud and forensic accounting

*Automotive*

- Managed a team investigating allegations that a co-owner of an automotive dealership was improperly diverting company assets for personal use. The engagement involved performing: dealership peer group analyses of soft costs and other expenses, extraction and analysis of the dealerships' Reynolds & Reynolds accounting system, overnight forensic data collections of over 25 custodians, and other investigative techniques.

- Assisted a global manufacturer of automotive parts investigate allegations of embezzlement, theft and financial statement fraud by ranking officers in one of its subsidiary's manufacturing plants in México. The engagement involved performing: extensive forensic accounting analyses, detailed cash disbursements review, examining expense reports, and various vendor filtering techniques. After investigating the officer's actions, the case revealed an elaborate web of fictitious companies and shell corporations set up to divert company funds via collusion and kickbacks. The outcome of this case included the referral of suspects to local authorities for prosecution, quantification of the theft amount, and assistance in the preparation of a bond claim so the company could recover assets from its fidelity insurance provider. (*)

*Diversified Industrial Products*

- Supported a leading global manufacturer of electronic instruments in an internal investigation into alleged asset misappropriation at its Russian office. Our team identified and quantified the total loss associated with certain employees' embezzlement of corporate funds over the course of a seven-year period. (*)

- Supported a global manufacturer of engineered wood products design a Crime Prevention Model at its Chilean subsidiary in accordance with Chilean Law 20.393, which establishes criminal liability for legal persons for the crimes of money laundering, terrorist financing and bribery of a national or foreign public official. (*)

- Advised counsel to a recycling company listed on the Australian Securities Exchange perform an internal investigation of certain employees violating the non-compete provisions of their employment agreements. We investigated allegations that upper level management had established side businesses in two separate countries and were diverting company assets to their own businesses by redirecting its vessels carrying the company's inventory. Performed several business intelligence procedures including conducting public database searches of ship manifest data, company searches, background searches and other forensic due diligence checks. After tracking the position and course of the vessel through its transponder information, we were able to map the coordinates via a scatter plot to show where the vessel had traveled and all of its ports of call. Managed several overnight forensic data collections of relevant IT servers, computer hard drives and other electronic data storage devices across three continents (Australia, Hong Kong, U.S.). After analyzing the transponder information and the electronic data gathered onsite, the company gathered sufficient evidence to support the allegations and terminated the suspects. (*)

(*) Denotes International Assignment



*Energy – Chemicals*

- Retained by the Chief Audit Executive to a leading global chemical company investigate whistleblower allegations involving potential revenue recognition concerns, including bill and hold, channel stuffing, and fictitious sales at several of operations throughout India. Following the investigation procedures, we assisted with remediation efforts including developing new accounting policies, performing inventory audits and AR balance confirmations and monitoring our recommended enhanced internal controls. (*)

- Engaged by the Internal Audit Department to a leading health and nutrition chemical company to investigate allegations regarding undisclosed conflicts of interest where the employees allegedly had ownership interests in certain distributors in Colombia. (*)

- Performed a comprehensive fraud risk assessment for a multinational agricultural chemical company per COSO's 2016 Fraud Risk Management Guide. Assessment procedures included a global fraud survey, forensic data analytics testing for financial misstatement risks, interviews and mapping to controls.

- Performed a privilege investigation to a global chemical company into hotline allegations regarding a procurement manager that was allegedly sharing bidding information with vendors to aid in their winning contracts in Brazil. (*)

- Engaged by the Internal Audit Department to a leading agricultural crop producer to investigate allegations of vendor kickbacks related to marketing and promotional vendors in India. (*)

- Engaged by the Internal Audit Department to a leading specialty chemical company perform an internal investigation related to a potential conflict of interest/bribery scheme in Hong Kong. Procedures performed included computer forensics services, document review in English and Mandarin and drafted deliverables for the Board. (*)

- Advised the General Counsel's Office to a leading specialty chemical company perform an investigation of alleged employee violations of its Code of Conduct policy. We investigated claims of potential collusion involving the improper allocation of certain employee's stock options. We performed off-site collections of the company's live server data, uploaded and reviewed the information after applying specific forensic search terms, and provided gathered evidence to the company.

- Engaged by the Internal Audit Department to a leading lithium producer perform an assessment into an overrun of capital expenditures at one of its subsidiaries in Argentina. We teamed with the company's external construction and project management consultants to: perform interviews, analytical procedures to identify trends and irregularities, detailed analysis of select invoices and supporting documentation (*e.g.,* proof of payment, purchase orders, competitive bids). (*)

- Advised the General Counsel's Office to a leading U.S.-based specialty chemical company respond to whistleblower allegations related to a procurement fraud/kickback scheme perpetrated by the company's procurement manager based in Shanghai, China. We performed off-site collections of the company's live

(*) Denotes International Assignment



server data, uploaded and reviewed the information after applying specific forensic search terms in Mandarin, and performed FMV pricing analyses of several Chinese suppliers. (*)

- Retained by the General Counsel's Office of a leading producer of hydrocolloid and cellulosic products to investigate potential conflict of interest risks at its subsidiary located in Cebu, Philippines. After performing electronic document review procedures, we identified potential issues related to cash advances, channel stuffing and accruing vs. expensing. In addition, we performed integrity due diligence procedures of several Filipino vendors and identified potential conflicts.  We further analyzed purchasing data and identified prices for products purchased above fair market value compared to prices of products purchased from other suppliers. (*)

- Retained by outside counsel to a global industrial gas and chemical company perform an internal investigation regarding potential employee improprieties. Procedures performed included: (i) Forensic data analytics of accounting data in order to identify relevant trends, anomalies and/or potential exceptions in order to test transactions; (ii) Collection and review of electronic documents in search of evidence for allegations; (iii) Forensic accounting procedures to identify manual entries impacting the P&L; (iv) Targeted interviews of management and accounting/finance personnel in Peru and Chile. (*)

- Retained by the General Counsel to a global chemical company to perform computer forensics imaging services and an electronic document review in response to a whistleblower claim. Our team reviewed thousands of documents in order to uncover a kickback scheme involving collusion between certain employees within the company's finance and human resources departments.

- Advised counsel to a leading global chemical and agriculture biotechnology company perform investigative procedures at its operation in Zimbabwe, Africa after an audit identified concerns regarding unreconciled bank accounts and other red flags. Our team was directed to investigate the reason for the non-reconciling accounts, understand the nature of the transactions, review of cash inflow/outflow processes, review of credit facilities/material loan transactions and several others areas. (*)

*Energy – Oil & Gas*

- Assisted an onshore energy exploration and production company perform certain investigative procedures in connection with whistleblower allegations of potential inappropriate activities and overbilling by one of its vendors. Company exercised its audit rights under the contract and requested our assistance to perform a contractual compliance assessment. Onsite procedures were performed in South Texas and related to the oil field construction related services. We developed a statistical, stratified random sample to perform a billing review of supporting documentation and financial records. The identified billing irregularities were extrapolated to the population of payables. Assisted our client successfully negotiate amounts owed to them by its vendor.

- Performed ongoing contractual compliance assessment procedures for one of the world's leading oil & gas companies. Onsite procedures were performed in South Texas on one of the company's civil construction service providers. Our team reviewed over 20,000 field tickets/invoices and vouched payments in order to investigative claims of duplicative invoices and over-charging for labor and materials.

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 8

- Developed a fraud awareness training course tailored to address a leading offshore oil and gas company's corruption and fraud risks in Trinidad & Tobago. Course covered specific local risks such as gifts, travel and entertainment and charitable contributions. (*)

- Assisted the Business Integrity Department of one of the world's leading oil & gas companies investigate possible inappropriate activities by one or more vendors and its colluding employees at its oil rig operation in South Texas. Our client exercised its right under its vendor agreements to audit the suspect vendor's books and records and requested that we provide forensic accounting investigative services. The engagement involved performing onsite fieldwork at the vendor's offices, numerous interviews (w/ ex-FBI and ex-Army investigators) and reviewing of accounting documentation. Uncovered several schemes in which our client's vendors inflated and over-charged our client over $1.5M during the investigative period.

*Energy – Mining & Metals*

- Advised counsel to a Colombian privately-owned company that invested in the development and re-start of a graphite mine and milling facility in Ontario, Canada. Led a cross-border team consisting of forensic accountants, valuation and business modeling experts and geologists. The matter involved performing a forensic review of the initial multi-million Canadian dollar investment and certain valuation services, including a capital expenditures review and a pricing analysis of the investment. Our team served as a trusted advisor to the CEO as we identified the root causes of budget increases, analyzed the reasonableness of the estimate-to-complete and prepared a pricing analysis of the total enterprise value of the graphite mine and milling facility for assessing our client's option to participate in a new financing round of the investment. (*)

*Financial Services*

- Assisted the Controllers and Liquidators to an insolvent financial institution in the Cayman Islands. Performed computer forensics, document review and forensic investigative services to assist in claims that the failed institution offered and sold to investors in the U.S. unregistered and restrictive penny stock shares which were part of a "pump and dump" scheme, obtaining over USD 75 million in illegal sales proceeds. (*)

- Performed shadow investigation services of an audit client's Cybercrime Investigation Unit to a leading multinational provider of electronic commerce and payment solutions for merchants, financial institutions and card issuers. Investigated allegations of a debit card processing currency exchange issue in Uruguay that resulted in a financial loss to the company. Our team opined on the sufficiency of the investigation involving interviews, document review, computer forensics, merchant and cardholder analyses, and the company's internal control assessment. (*)

*Insurance*

- Assisted in the investigation of a property and casualty insurer on behalf of a re-insurer that suspected claim submissions related to the 2004 Florida hurricanes were fraudulent and improperly attributed to one

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 9

particular peril instead of the peril or combination of perils that actually caused the losses. Our team identified significant issues upon review of the claim files such as redacted and altered hurricane names and dates, missing documentation, and incorrect claim attributions.

*Media & Entertainment*

- Worked with the CFO and Director of Internal Audit of a leading Spanish-language radio broadcasting network in the investigation of allegations of employee embezzlement. The matter involved performing computer forensics of company hard drives, e-mail review in multiple languages, and conducting forensic interviews. The investigation ultimately led to the presentation of a Fraud Awareness program, commentary of the company's internal control structure, and specific recommendations and compliance procedures.

*Professional Firms & Services*

- Assisted the CFO of a global marine services company in the investigation of a potential employee embezzlement scheme at its operations in Greece. The matter involved performing bank reconciliations, interviews of key personnel and other forensic procedures to identify questionable payments and quantify potentially misappropriated assets. (*)

- Assisted a leading Australian professional infrastructure and environmental services company with an internal investigation regarding alleged improper payments and FCPA violations of its subsidiary operations in Ecuador. Procedures performed included: (i) Forensic data analytics of accounting data in order to identify relevant trends, anomalies and/or duplicate payments; (ii) Forensic imaging and review of electronic documents; (iii) Targeted interviews of senior management; (iv) Identifying questionable payments made through the subsidiary and joint ventures; (v) Assessing internal control deficiencies; (vi) Preparation of evidentiary trial materials for a motion for a Temporary Restraining Order of certain assets within the U.S. (*)

- Advised counsel to a recycling company listed on the Australian Securities Exchange perform an internal investigation of certain employees violating the non-compete provisions of their employment agreements. We investigated allegations that upper level management had established side businesses in two separate countries and were diverting company assets to their own businesses by redirecting its vessels carrying the company's inventory. Performed several business intelligence procedures including conducting public database searches of ship manifest data, company searches, background searches and other forensic due diligence checks. After tracking the position and course of the vessel through its transponder information, we were able to map the coordinates via a scatter plot to show where the vessel had traveled and all of its ports of call. Managed several overnight forensic data collections of relevant IT servers, computer hard drives and other electronic data storage devices across three continents (Australia, Hong Kong, U.S.). After analyzing the transponder information and the electronic data gathered onsite, the company gathered sufficient evidence to support the allegations and terminated the suspects. (*)

- *Education* – Engaged by outside counsel to a prestigious American university to perform an internal investigation of potential improper expense reimbursements related to medical research grants issued by the National Institutes of Health, an agency of the U.S. Department of Health and Human Services. Our

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 10

team supported the university's compliance department respond to inquiries raised by the U.S. Attorney's Office. This matter involved (i) assisting our client verify the completeness and accuracy of amounts reimbursed to certain researchers and (ii) providing guidance on the structure and content of the university's final report of findings to the federal government.

- *Education* – Performed expanded audit procedures at a private, higher education institution under the direction of its President and Legal Counsel involving the investigation of the propriety of transactions and potential mismanagement related to various Federal grants. The engagement entailed reviewing over ten years of expenditures, performing fixed asset verifications, and conducting forensic interviews. The university restated their financial statements as a result of our findings.

*Real Estate & Construction*

- Assisted a leading resort tour operator investigate whistleblower claims of potential conflict of interests and improprieties perpetrated by certain corporate employees. Procedures performed included: (i) Data forensics to identify fictitious vendors and ghost employees; (ii) Collection and review of electronic documents in order to support allegations; (iii) Targeted interviews of whistleblowers and implicated employees; (iv) Review of vendor contracts for potential improprieties. (*)

- Performed due diligence procedures for a leading South African financier of a U.S. private lending institution retained to provide financing for a hotel construction project in South Africa.  Procedures performed included: verification of corporate legal entity, meeting and interviewing management, performing open source third-party background checks on shareholders and related entities, reviewing contractual language and verification of escrow account ownership designated to hold construction funds. Based on our findings, the financier was able to avoid entering into a potential Ponzi scheme and ceased all business relations with the private lending institution. (*)

- Advised counsel to a lodging company with a portfolio of high-end properties investigate potential improprieties of its management operator at one of its resorts in Los Cabos, Mexico. Performed investigative procedures to identify instances of non-compliance within the following process areas: service gratuity distribution process, inappropriate payments to labor union representatives and complimentary items (F&B, Rooms, Spa). (*)

- Led investigation of a prominent restaurateur in Miami to identify potential under-reporting of revenues suspected by the principal owner to a high-end boutique hotel. Our client exercised its right under the joint venture agreement to audit the suspect's book and records and requested that we provide forensic accounting investigative services. Identified several off-the-books intercompany transfers, non-approved complimentary rooms provided to guests, and other accounting improprieties.

- Assisted limited partner in several multi-million dollar real estate projects in downtown Miami with investigation of potential accounting improprieties by general partner. Limited partner owned different percentages of three separate high-rise projects and suspected improper expense allocations by general partner, as well as potential theft and mismanagement.

(*) Denotes International Assignment



*Retail & Consumer Products*

- Performed a comprehensive fraud risk assessment for a multinational consumer products company following an acquisition in China. Our review focused on the company's third-party risks in China due to its extensive use of distributors in the region. (*)

- Assisted the Financial Secretary and Comptroller of Customs of a country's Department of Ministry of Finance investigate and quantify potential understated import duties paid by one of the country's top importers. The suspect importer allegedly was submitting falsified invoices to customs to understate import duties payable for over 10 years. The matter involved gathering evidence for criminal prosecution for the Attorney General's office by performing forensic technology data collection/processing, identifying falsified invoices from over one terabyte of electronic data, transaction testing through statistical sampling, and other investigative procedures. Identified a consistent pattern of under-reporting duties where approx. 9 out of 10 invoices reviewed contained alterations and understated import duties. Extrapolated results indicated that import duties were understated by $4.5 million. (*)

- Assisted the Internal Audit Department of a leading athletic footwear and athletic apparel marketing company investigate allegations of kickbacks and breach of contracts with one of its international licensees. The internal fraud investigation entailed performing forensic interviews, review of deposition and arbitration transcripts, and background checks of multiple companies/suspect individuals. Several computer forensic procedures were also performed involving the imaging of suspect employee hard drives, applying keyword search terms to the electronic universe of data, and reviewing thousands of electronic documents for evidence of said allegations.

*Technology*

- Advised the Corporate Counsel and Director of Internal Audit to a leading operator of wireless communication towers investigate a tip that the one of its managers was improperly recorded certain fixed asset journal entries for personal gain. We held discussions with the investigative leaders, reviewing a sample of reconciling items and all adjusting journey entries.

- Provided ongoing forensic support to the General Counsel's Office and Internal Audit Department to a leading global wireless distributor. Also provided ongoing support to the financial audit team assessing the scope, competency and conclusions of various investigations impacting an audit client. Representative list of shadow investigations or compliance assessments performed include: (*)

  ► Post-acquisition internal investigation matter. (Hong Kong)
  ► Whistleblower allegation regarding potential kickbacks, a close personal relationship between the President of the company and one of its vendors, providing preferential treatment and non-approved gifts. (Argentina)
  ► Assess the validity of claims regarding suspicious vendor payments. Payments were made from the company's reserve account and were identified after a reconciliation of the reserve account was performed. Performed forensic imaging and processing of dozens of custodians, processed and analyzed over 50,000 electronic documents written in Spanish. (Mexico)

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 12

- ► Pre-acquisition due diligence to assess FCPA and anti-fraud program of target entities. (United Kingdom, Sweden, Spain)
- ► Cross-border collusion scheme in writing down of inventory below fair market value, selling the inventory for scrap, and personally purchasing the inventory and then re-selling it at market value at a profit. (Mexico)
- ► Asset misappropriation allegations of a billing clerk and warehouse manager. (Mexico)
- ► Manipulation of sales in order to reach commission targets; analyzing control weaknesses in its prepaid business. (Peru)
- ► Allegations regarding subsidiary's senior management team were involved in potential conflicts of interest, inappropriate business dealing and bid rigging for personal gain. (Argentina)
- ► Conflict of interest claims in connection with suspicious marketing expenditures. (Brazil)
- ► Expanded audit procedures in connection with validating the authenticity of emails that contained payment authorizations from the company's business partners. Purpose of the procedures was to review the metadata behind the emails and determine whether any of the emails had been tampered with or altered.
- ► Pre-acquisition due diligence to assess FCPA risk of target. (Japan)
- ► Allegations regarding employee violations of the company's Code of Conduct policy and assessed current and past practices related to anti-bribery/anti-corruption risk areas. (Vietnam)

- Performed an anti-fraud risk assessment for a worldwide provider of products and support services in the cable industry. Our investigative procedures uncovered related party transactions, off-the-book cash transactions and several potential employee conflict of interests. Presented to the CEO several operational and regulatory recommendations to potentially improving the business' operations.

*Transportation*

- Engaged by the CFO to a privately-held logistics company perform three concurrent forensic assignments as the company prepared for an IPO: (i) investigation concerning allegations of improper payments made to employees at five of its subsidiary locations; (ii) targeted analysis of executive management's Travel & Entertainment expenditures in conjunction with an assessment of potential tax ramifications; (iii) FCPA compliance assessment and Code of Conduct training at the company's LATAM headquarters in Guadalajara, Mexico. (*)

## Corporate compliance and regulatory

*Diversified Industrial Products*

- Retained by the General Counsel Office for a leading manufacturer of aluminum packaging solutions to manage its anti-corruption training program. Our team developed tailored training materials and delivered Code of Conduct, FCPA and anti-boycott training at its subsidiary locations in Mexico, France, India and Hong Kong. (*)

- Assisted the Corporate Development Department perform a FCPA due diligence risk assessment for a leading manufacturer of aluminum packaging solutions. Due diligence procedures were performed to an

(*) Denotes International Assignment



acquisition target with operations in San Luis Potosi, Mexico. This matter involved a risk assessment, general ledger transaction testing and targeted forensic interviews. Identified several larceny incidents, kickback schemes and payments made under duress to local gang and drug cartels. The engagement resulted in identifying risk areas that allowed the purchasing company to understand the risk levels and instances of potential FCPA violations that could compromise the deal in progress. (*)

- Performed FCPA due diligence risk assessment procedures for a leading manufacturer of aluminum packaging solutions. Due diligence procedures were performed to an acquisition target with operations in Argentina, Brazil and Mexico. This matter involved a risk assessment, detailed general ledger transaction testing, open source background checks and targeted forensic interviews. Identified several incidents of alleged occupational fraud, including invoice kickbacks, fraudulent payroll disbursements and larceny. The engagement resulted in identifying risk areas that allowed the purchasing company to understand the risk levels and instances of potential FCPA violations that could compromise the deal in progress. (*)

*Energy – Chemicals*

- Assisted the Internal Audit Department to a leading agricultural chemical company perform forensic data analytics to identify potential anomalous revenue recognition, channel stuffing and bill and hold transactions. Our team tailored its sample selections and interviews based on the analytics results and performed compliance assessment procedures at two separate site locations in Indonesia and Pakistan. (*)

- Assisted the General Counsel to a specialty chemical company perform eDiscovery and surveillance investigative services to assess employee compliance with the company's antitrust policies.

- Assisted the Compliance Department to a leading specialty chemical company perform an ABAC compliance assessment at two separate site locations throughout South Korea and Mexico. (*)

- Retained by outside counsel to a global chemical and industrial gas company to perform pre-acquisition anti-bribery/anti-corruption due diligence procedures to acquisition targets in South Korea and China. (*)

- Assisted the Compliance Department to a leading specialty chemical company develop and monitor its third-party risk management program. Our team collected data utilized by the Internal Audit Department; obtained and analyzed the company's global third-party population and understand onboarding and due diligence procedures; reviewed and made recommendations of the third-party screening procedures; assessed the risk level associated with individual third-party partners and developed with the client the appropriate level of compliance assessment procedures; identified potential gaps and made recommendations related to the company's Anti-Corruption policies and procedures; provided updates to the Board of program's development and progress.

- Assisted the General Counsel and Chief Audit Executive to a leading chemical and industrial gas company perform an ABAC compliance assessment at two separate site locations throughout Russia and Argentina. (*)

- Advised the General Counsel and Global Compliance Officer to one of the leading global chemical companies enhance its global third-party risk management policy and procedures. We assisted the

(*) Denotes International Assignment



company's Internal Audit department monitor the effectiveness of its program and developed recommendations to improve the areas of greatest risk.

- Supported a leading petrochemical company perform compliance program monitoring activities as required by the DOJ, SEC and the U.K. Serious Fraud Office. Compliance program monitoring activities included performing an ABAC compliance assessment of one of its largest distributors and sales agents located in Mexico. The assessment included conducting onsite interviews of management, performing targeted transaction testing of high-risk general ledger transaction, conducting a detailed analysis of sales commissions earned by the third party, a detailed review of all sales contracts with state-owned entities and reporting findings to the independent external compliance monitor. (*)

- Retained by the General Counsel Office of a leading specialty chemical company to perform post-acquisition compliance integration services. The work included performing anti-bribery and anti-corruption (ABAC) and trade controls compliance assessments of its subsidiaries located in Bangalore, Panoli and Mumbai, India. Additionally, we led three Code of Conduct/FCPA training courses for the company's local personnel regarding compliance with the organization's Business Conduct Standards, FCPA, local anti-corruption laws and high-risks. (*)

- Assisted the Internal Audit Department to a leading global polystyrene producer perform an ABAC compliance assessment at four separate site locations throughout China and Indonesia. (*)

- Advised the General Counsel and Global Compliance Officer to a leading global chemical company enhance its anti-corruption policy and procedures as part of its Global Code of Conduct and Business Ethics Policy.

- Retained by the Internal Audit Department of a leading specialty chemical company to perform a FCPA compliance assessment of its subsidiaries located in Semarang and Jakarta, Indonesia. The work included financial analyses, review of the relevant books and records, and interviews of management, sales personnel, accounting personnel and key third parties. Additionally, we led two Code of Conduct training courses for the company's local personnel and several of its third parties (*i.e.*, customs brokers, freight forwarders, external counsel) regarding compliance with the organization's Business Conduct Standards, FCPA, local Indonesian anti-corruption laws and high-risks. (*)

- Following a FCPA compliance assessment performed for one of our chemical clients, we were retained by the company's outside counsel to assist in a corruption investigation so that counsel may comment on the possibility of FCPA violations, its analysis of the legal implications of its findings, and recommendations for appropriate remedial measures. Our team assisted in the analysis of disbursement documentation, translating of financial information from Bahasa Indonesia to English, and supporting outside counsel perform focused onsite interviews. Based on our findings, we served as an advisor to our client and its outside counsel implement remediation protocols at the company and whether the results of the internal investigation should be disclosed to the DOJ. (*)

- Retained by outside counsel to one of the world's leading developer and supplier of advanced plant genetics to perform pre-acquisition anti-bribery/anti-corruption due diligence to an acquisition target. Due diligence procedures were performed to one of the largest field crop seed breeders, producers and

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 15

suppliers in Africa. We tested the accounts payable, travel and entertainment, and specific general ledger accounts leveraging our library of anti-fraud tests including the text mining of the journal entry descriptions. We identified several questionable entertainment expenses with high-ranking government officials. Using our visual analytics and text mining capabilities, we quickly identified the transactions and employees associated with the expense. Onsite procedures were performed at ten locations in South Africa, other African countries and Argentina. We provided observations of the target's current and past practices related to compliance and highlighted higher-risk activities. (*)

• Assisted the Global Compliance Officer to a leading specialty chemical manufacturer conduct an analysis of its existing compliance program and perform a FCPA compliance assessment at three of its operations in China. Managed our international forensic team perform onsite procedures at three Chinese locations: Fengxian, Yixing and Nanjing. Two of the operations were wholly-owned subsidiaries and the third was a joint venture. We provided recommendations regarding the company's internal controls and identified compliance program risk areas. (*)

• Retained by the Internal Audit Department of a leading specialty chemical company to perform a FCPA compliance assessment of its subsidiaries located in Guadalajara and Ecatepec, Mexico. The work involved the review of the relevant books and records, interviews of management, analyzing threatening communications by local organized groups, and investigating conflict of interest allegations. (*)

• Retained by the General Counsel Office of a leading agricultural chemical company to investigate potential bid rigging and FCPA risks at its subsidiaries located in Manila and Cebu, Philippines. Using our visual analytics and text mining capabilities, we identified multiple high-risk transactions and process inefficiencies that warranted further on-site inquiry related to facilitating payments and other potential improper payments to government officials. These analyses provided targeted transactions and inquiries to help us focus our fieldwork, which ultimately uncovered an elaborate extortion scheme being perpetrated against the company by members of a local governmental agency. Additionally, we led two Code of Conduct training courses for the company's local personnel and several of its third parties (*i.e.*, customs brokers, freight forwarders, external counsel) regarding compliance with the organization's Business Conduct Standards, FCPA, local Filipino anti-corruption laws and high-risk areas within the Asia Pacific region. Based on our findings, we served as an advisor to our client regarding whether the results of the internal investigation should be disclosed to the Department of Justice, which has a voluntary disclosure program for the FCPA. (*)

• Following a preliminary FCPA Risk Assessment performed for a leading global plastic, latex and rubber manufacturer in Indonesia, we were retained by the company's outside counsel to assist in a corruption investigation so that counsel may comment on the possibility of FCPA violations, its analysis of the legal implications of its findings, and recommendations for appropriate remedial measures. We assisted in the collection, processing and analysis of over 350,000 electronic documents written in Bahasa Indonesia. These documents were reviewed by our cross-border investigative team, categorized, and responsive documents were translated into English in preparation for on-site focused interviews. Based on our findings, we served as an advisor to our client regarding whether the results of the internal investigation should be disclosed to the Department of Justice, which has a voluntary disclosure program for the FCPA. (*)

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 16

- Assisted the Internal Audit Department to a leading global plastic, latex and rubber manufacturer perform a Code of Conduct and FCPA compliance review at its operation in Indonesia. Performed detailed review of high-risk general ledger transactions and led interviews in Indonesian (through the use of a local translator). Identified numerous noncompliance and potential violations of corruption laws, as well numerous control weaknesses. Led two Code of Conduct training courses for the company's local personnel regarding compliance with the organization's Business Conduct Standards and high-risk areas within the Asia Pacific region. (*)

- Assisted the Internal Audit Department to one of the fastest growing companies in the Brazilian Agricultural market perform a FCPA compliance review to assess compliance with its Code of Ethics and Business Conduct Standards at its operation in Campinas, Brazil. Performed detailed review of high-risk general ledger transactions and led over 30 interviews in Portuguese, Spanish and English. Identified numerous high risks related to potential violations of corruption laws, as well numerous control weaknesses. Led multiple training courses for the company's management team regarding anti-corruption and high-risk areas within the Brazilian chemical and agricultural industries. (*)

- Performed FCPA due diligence risk assessment procedures for a leading industrial chemical distributor in the U.S. Due diligence procedures were performed to an acquisition target at one of the largest privately-held chemical companies based in Recife, Brazil. This matter involved a risk assessment, detailed ledger transaction testing, employee T&E review and targeted forensic interviews. Other allegations of wrongdoing and impropriety were also investigated. The engagement resulted in identifying risk areas that allowed the purchasing company to understand the risk levels and instances of potential FCPA violations that could compromise the deal in progress. (*)

*Energy – Chemicals / Life Sciences*

- Retained by a global manufacturer to perform a contractual compliance assessment of its business partner. Evaluated compliance of the profit sharing provisions related to the party's Material Supply Agreement. Our team analyzed the complex accruals, true-ups and Net Income calculations related to more than $100 million of royalty payables.

- Assisted a multi-national pharmaceutical, chemical and health care company with an ongoing contractual compliance assessment of a joint venture with a global pharmaceutical company. This multi-phased review involved investigating potential underreported of royalties in connection with the company's Trademark and Domain Name Licensing Agreement. Procedures were designed to investigate potential underreported Net Sales due to exclusion of certain product families, misclassification of third-party sales and system limitations related to the use of non-SAP reporting systems in numerous countries. Procedures included performing reconciliations of data reported in the financial reporting system to transactional level sales data for select countries, the company's financial statements, and to the Trademark Fee Reports.

- Assisted a multi-national pharmaceutical, chemical and health care company with an ongoing contractual compliance assessment of a joint venture with a global pharmaceutical company. This multi-phased review involved assessing compliance with the pharmaceutical company's Cost of Manufacture, its Net Proceeds and Royalty calculations, and all applicable Sales Deductions related to U.S. and Canada product sales. Specific procedures were designed to investigate potential channel stuffing and excessive freight charges

(*) Denotes International Assignment



by the joint venture partner and calculation errors related to the rebates in the Coverage Gap Discount Program and the annual health care reform fee enacted by the U.S. Health Care Reform legislation.

- Assisted a multi-national pharmaceutical, chemical and health care company with a contractual compliance analysis of a joint venture with a global pharmaceutical company. This multi-phased review involved assessing compliance with the pharmaceutical company's Cost of Manufacture, its Net Proceeds and Royalty calculations, and all applicable Sales Deductions related to U.S. and Japan product sales. Compliance procedures were also rendered on behalf of our client to a third-party authorized generic manufacturer's Net Proceeds calculations.

- Assisted a multi-national pharmaceutical, chemical and health care company with a contractual compliance analysis of a joint venture with a global pharmaceutical company.  The engagement involved several phases including: 1) the capital expenditures analysis, 2) the manufacturing cost review, and 3) the sales, royalties and rebates analysis. The investigative team performed various procedures at the financial headquarters in the U.S., including, but not limited to: forensic interviews, review of cash disbursements, fixed asset ledger review, manufacturing costs data analysis, testing of service department costs, royalty recalculations and verification, and review over managed care contracts and rebate payments.

*Energy – Mining & Metals*

- Assisted the Internal Audit Department to a leading lithium producer perform an ABAC compliance assessment and Code of Conduct/FCPA training at its sales office and manufacturing facility in Argentina. (*)

- Conducted a pre-acquisition ABAC/FCPA due diligence procedures for a Canadian private equity firm of its acquisition of a natural gas and mining company in Chile. Performed interviews of management in Spanish, reviewed documents (in Spanish), performed background checks of senior executive management and prepared a report of findings and recommendations. (*)

- Assisted a leading European conveyor belt manufacturer perform market research and strategy support services for the Latin American mining market.  Performed focused interviews of competitors and customers (mining companies) to assess the market opportunity for coal, iron ore and copper mines. Additionally, we assessed customer demand and gathered competitive market intelligence.

- Conducted an assessment of compliance risks for a Fortune 500 mining company at its wholly-owned mining subsidiary operation in Salta, Argentina. Performed detailed review of high-risk general ledger transactions and interviews with representatives of executive group, accounting, finance, customs broker and outside counsel. Identified risks related to potential violations of corruption laws, including local corruption laws and the U.S. FCPA. Led training for the company's management team regarding anti-corruption and high-risk areas within the mining industry. (*)

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 18

*Energy – Oil & Gas*

- Provided contract risk and ABAC/FCPA compliance services to one of the largest providers of gas storage companies in Canada. Our client exercised its audit rights under its contract of one of the company's vendors operating in Monterrey, Mexico. The procedures performed included investigating for potential overbilling, analysis of relevant policies and procedures covering areas subject to the FCPA requirements (*e.g.,* third parties, consultants, travel & entertainment), testing of selected transactions with particular focus on transactions with government officials and SOEs, as well as other high risk areas and interviews with local management and third parties. (*)

*Financial Services*

- Conducted a pre-acquisition ABAC/FCPA due diligence procedures for a Canadian private equity firm of its acquisition of an investment banking and management consulting firm in Hong Kong. (*)

- Provided an Anti-Money Laundering Compliance review for a leading high-volume processor of electronic transactions and related money transfers to the Latin American region. Mr. Luis performed a vouching analysis of some of the company's key compliance regulations and helped identify both major internal control weaknesses, as well as, suspicious activities consistent with money laundering schemes. The engagement concluded with specific internal control recommendations and an AML Compliance Manual drafted in accordance with Title III of the U.S.A. Patriot Act, FinCEN regulatory rulings, and the Bank Secrecy Act.

*Government & Public Sector*

- Assisted the largest telecoms provider in Grand Cayman to perform a forensic contract review in connection of one of its licensees. The engagement entailed reviewing various global agreements, understanding of the systems used to calculate, record and report financial information, reconciling selected revenue and deduction line items, identifying any variances and calculating the impact of the variances. (*)

- Assisted Florida County with analysis of inter-facility patient transportation services provided by hospital system in light of allegations of overbilling by third-party administrator.

*Healthcare*

- Assisted counsel for Florida psychiatric practice in response to Medicare audit. Identified issues related to sample design and extrapolation, including lack of replicability. Our statistician's testimony and report were used to affect an appropriate settlement.

- Assisted the Internal Audit Department and general counsel's office of one of the U.S.'s leading academic managed healthcare organizations to perform an internal investigation on two of the organization's mental health service providers. The investigation involved the organization's allegations that they were being overbilled by a vendor for mobile crisis outreach services.

(*) Denotes International Assignment



*Media & Entertainment*

- Assisted the Global Chief Compliance Officer to a leading U.S.-based casual dining company perform a corruption risk assessment of its subsidiary located in São Paulo, Brazil. The assessment focused on analyzing compliance with the FCPA and the Brazilian Anti-Corruption Law (*i.e.,* Brazil's Clean Company Act). Our procedures included conducting an analysis of the existing compliance program through onsite interviews of local management and the review of ethics and compliance policies. We provided recommendations regarding the company's internal controls and enhancements to its compliance environment. (*)

- Retained by the Deputy Chief Compliance Officer to a leading Hispanic media and technology company perform a contractual compliance assessment of one of its joint ventures partners based in Colombia. Our team analyzed the JV's Colombian television production division that provides broadcasting services throughout Latin America. We analyzed the JV's existing system of internal controls and compliance program, assessed its compliance with respect to applicable laws, including but not limited to the U.S. Foreign Corrupt Practices Act and the Colombian Ley 1474 and provided recommendations for strengthening its internal controls and compliance program to mitigate identified risk areas. (*)

*Retail & Consumer Products*

- Engaged to perform data analytical procedures and report our findings for one of the leading electronic home security providers in México. The team determined whether the company had accurately deducted A/R amounts in excess of $95 million MXN based on guidelines established by the Mexican tax authorities. The final deliverable consisted of an Expert Report (written in Spanish) that was used by our expert witness during a presentation made to the Mexican tax authorities. (*)

- Assisted one of the world's largest international retailers uncovering a cross-border sales tax Ponzi scheme for all of the company's Mexican-based subsidiary retail operations. The case involved performing extensive data manipulation and vouching exercises between client invoices and Mexican Custom's records in order to discover the fictitious invoices generated. (*)

*Technology*

- Supported a leading multinational software company perform monitoring activities as required by its Deferred Prosecution Agreement reached with the SEC. We assisted the company perform anti-corruption compliance assessments of its highest risk third parties. The three-year assignment involved performing reviews of more than 40 third parties per year (120 overall) in over 12 different countries around the world. (*)

- Performed forensic accounting analyses to one of the largest privately-held prepaid calling card companies in the U.S., in order to review their books and records to determine if fraudulent transactions played a role in inter-company accounts not reconciling. The engagement team worked closely with the company's chief financial officer and controller in order to understand the company's policies and procedures and detect the potential threat of internal/external money laundering and fraud. The matter involved creating a

(*) Denotes International Assignment



database for the company's cash receipts and disbursements, analyzing over one million records of data, and investigating the use of phantom employees in their payroll. The engagement concluded with extensive recommendations for internal controls and an official procedures manual for Anti-Money Laundering Compliance, specifically with Title III of the U.S.A. Patriot Act.

## Insurance claims / Business interruption

*Automotive*

- *Residual value insurance claim* – Retained by one of the largest privately-held Fortune 100 companies in the U.S. to assist counsel in an insurance arbitration against a major global re-insurance company. Over $650 million in total claims were filed with the carrier in connection with their residual value insurance (RVI) policy as a part of the company's $5 billion portfolio. Mr. Luis specifically assisted with the following: managerial supervision of the engagement team, attendance at several opposing expert depositions, preparing our expert witness to testify during the arbitration proceedings, in the creation of a complex database, capturing internal portfolio data and external investigative results, and ultimately "re-processing" the RVI claims for a statistically representative sample of over 300 lease files from a population of over 300,000 leases. The engagement concluded with providing the client with statistically valid estimates of potential over-claimed amounts under different scenarios to assist counsel in measuring litigation exposure. A favorable settlement was reached at the conclusion of the arbitration.

*Diversified Industrial Products*

- *Fidelity claim* – Advised the Risk Management and Treasury Department of a leading global manufacturer prepare a claim related to employee embezzlement at its Russian office. (*)

*Financial Services*

- *Extra expense and property claim* – Prepared a $30 million claim for one of Canada's largest banks related to damages stemming from the World Trade Center collapse. The insurer denied coverage and our client filed suit seeking payment of its claim.  The claim involved creating sophisticated databases to capture 1000's of pages of invoices related to the property damage and ongoing extra expense costs. Our financial model quantified the loss under several different scenarios and facilitated the currency exchange rate conversion of all CAD$/USD$ invoices at different points in time. Outside counsel representing our client utilized our model to assist them reach a favorable settlement. (*)

*Real Estate & Construction*

- *Business interruption and property claim* – Managed preparation of a $60 million construction defect claim related to water damage and toxic mold-related losses at a 21-building luxury apartment complex for a leading REIT in New York. Our team created a complex database for capturing of all of the insured's property costs, as well as a financial model to quantify the insured's business interruption losses. The claim involved multiple carriers and responding policies including: environmental, general liability, and property damage coverage.

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 21

- *Business interruption claim* – Reviewed claims on behalf of a major U.K.-based property carrier related to claims submitted by a global hotel chain in connection with damage at six of its properties in Cancún, México after Hurricane Wilma. Parallel to the review of the hotel chain's claims, our team reviewed the initial and revised reserve calculations prepared by the property carrier's insurance adjuster. Assisted carrier and its consultants with assessment of propriety of quantum issues, discussed coverage positions and the principal drivers increasing the reserve amounts. (*)

- *EPLI claim* – Developed a financial model to project future costs of implementing consent decree provisions from settlement of an Employment Practices Liability Insurance (EPLI) claim in connection with Americans with Disabilities Act and Fair Housing Act litigation. The litigation involved the remediation of 71 apartment complexes for one of the nation's leading REITs. Our analysis was used by company management for use in settlement negotiations.

- *Business interruption and extra expense claim* – Assisted in the preparation of an $8 million time element loss estimate on behalf of a major international hotel chain relating to damages caused by Hurricane Wilma in October 2005 to one of its hotels in Cancún, México. The loss estimate involved preparation of a complex lost business income model and a market analysis of the competitive set in the local area. (*)

*Retail & Consumer Products*

- *Business interruption and property claim* – Assisted a Canadian multi-national juvenile products manufacturer, with the preparation of a USD 10 million / R$17 million time element and property claim related to a fire loss. The loss occurred at one of the company's wholly-owned subsidiaries in Campos dos Goytacazes, Brazil. The engagement involved creating two financial models - one for the local carrier in Brazil and another for the company's global policy carrier in the UK. The claim involved creating two financial models with bifurcated coverages, translating the models into English and Portuguese, currency exchange conversions, and others. (*)

*Technology*

- *Fidelity claim* – Advised the General Counsel to a global telecommunications company investigate and prepare a claim under the company's Employee Dishonesty policy stemming from asset misappropriation issues at its Mexican subsidiary. Our team served as a bridge between our US-based client, the company's Mexican subsidiary, its local outside counsel in Mexico and the carrier's claim investigators. Based on our findings, our client was able to obtain full recovery of its losses, including all consultants' fees. (*)

(*) Denotes International Assignment



## Education and certifications

- Harvard Leadership Program – Harvard Business School, Harvard University
- Certificate in Foundations of Accounting and Auditing (CFAA) – Chapman Graduate School of Business, Florida International University
- Master of Business Administration (Finance and Strategic Management) – University of Miami
- Bachelor of Science (Biology, Chemistry and Business Administration) – University of Miami
- Study Abroad (Tokyo, Japan):  Cost Accounting and Intensive Japanese – Sophia University
- Chemical-Terrorism Vulnerability Information Authorized User – Office of Infrastructure Protection, U.S. Department of Homeland Security
- Certified Fraud Examiner
- Certified Forensic Interviewer
- Partner Training Program – EY Global NextGen

## Professional memberships and affiliations

- General Member, Association of Latino Professionals For America (ALPFA)
- Member, Association of Certified Fraud Examiners (ACFE)
- Member, International Association for Interviewers (IAI)
- Associate Member, Risk and Insurance Management Society (RIMS)
- Associate Member, Phi Kappa Phi National Honor Society
- Member, Easter Seals, Inc. (disability volunteer services)

## Publications

- Author to "Real Estate in a Pandemic and Beyond – Fraud Prevention Checklist", April 2021.
- Co-author to "Warning: In a Pandemic, Real Estate Companies Are Particularly Vulnerable to Fraud" – *Real Estate in a Pandemic: Insights on Dealing with Distress and Loan Restructuring*, November 2020.
- Author to "A Blueprint to Managing Corporate Fraud Risk during a Pandemic", published by the Institute of Internal Auditors, July 2020. *(published in multiple languages: English, Spanish, Portuguese, Japanese)*
- Co-author to whitepaper "EY's Global Fraud Survey 2016 – Chemical Industry Results," September 2016.
- Author to whitepaper "Forensic Services in the Chemical Industry," March 2015.
- Contributing author to "International Investigations: Successful Planning and Execution" – *Litigation Services Handbook, The Role of the Financial Expert* (Fifth Edition), published by John Wiley & Sons, Inc., May 2012.
- Assisted with article "Are You at Risk for a Multi-Million Dollar ADA or FHA Lawsuit?" *Multi-Housing News*. 15 July 2008. 25 August 2008 <http://www.multihousingnews.com/multihousing/search/article_display.jsp?vnu_content_id=1003827656>.

(*) Denotes International Assignment



## Speeches and presentations

- Served as a panelist for Association of Corporate Counsel, Greater Philadelphia Chapter, "What To Do With Suspicious Whistle Blower Complaints" – Virtual (August 2021).
- Co-presentation with Ballard Spahr LLP, "Aftermath of PPP Lending: Lender Compliance, Risk and Enforcement" – Virtual (July 2021).
- Levick, Richard S., host. "An Accountant's View of Fraud and Corruption." In House Warrior, *Corporate Counsel Business Journal*, 2 June, 2021, https://open.spotify.com/episode/6MJk5xjgoNBVrzYchD8QGr.
- Co-presentation with Paul Hastings LLP, "PPP Fraud and Investigation Risks for Lenders" – Virtual (June 2021).
- Co-presentation with Blank Rome LLP, "Fraud Risks & Enforcement Trends" – Virtual (February 2021).
- Led presentation for the Association of Certified Fraud Examiners and The Institute of Internal Auditors South Florida Conference, "Managing Corporate Fraud Risk during a Pandemic" – Virtual (January 2021).
- Continuing Professional Education Seminar: "A Blueprint to Managing Corporate Fraud Risk During a Pandemic" – Virtual (December 2020).
- Led presentation for the Allinial Global Association, "Managing Fraud Risks in Latin America during the Pandemic" – Virtual (November 2020).
- Led presentation for The Florida Bar International Law Section, "The Risks of Fraud during the Pandemic" – Virtual (November 2020).
- Co-presentation with Blank Rome LLP, "Validating PPP Loan Forgiveness Requests – What Lenders Can Expect" – Virtual (October 2020).
- Led presentation for The Real Estate Club, Union League of Philadelphia, "Navigating Risk in Real Estate during the Pandemic" – Philadelphia, PA (October 2020).
- Surowiec, Carol, host. "Mitigar el Riesgo de Fraude en el Sector Inmobiliario Durante la Pandemia." Knowledge Center, Real Estate Podcast Series, EisnerAmper, 12 October 2020, https://www.eisneramper.com/mitigar-riesgo-fraude-inmobiliario-durante-pandemia-podcast-1020/.
- Surowiec, Carol, host. "Mitigating Fraud Risk in Real Estate During the Pandemic." Knowledge Center, Real Estate Podcast Series, EisnerAmper, 12 October 2020, https://www.eisneramper.com/mitigating-fraud-risk-real-estate-during-pandemic-podcast-1020/.
- Served as a panelist for The Institute of Internal Auditors Philadelphia Chapter, Spring Summit, "Stakeholder Expectations of Fraud for the Future" – Philadelphia, PA (May 2019).
- Continuing Professional Education Seminar: "Mitigating risks, reducing costs, and taking action through Forensic Data Analytics" – Philadelphia, PA (December 2018)
- Led presentation for The Institute of Internal Auditors Philadelphia Chapter, Fall Conference, "Forensic Data Analytics" – Philadelphia, PA (November 2018)
- Led panel discussion for The Institute of Internal Auditors Philadelphia Chapter, Fall Conference, "Next Generation Fraud Detection" – Philadelphia, PA (November 2018).
- Led panel discussion at Philadelphia Business Forum, "Third Party Risk Management: Do threats always come from outside your organization?" – Philadelphia, PA (November 2016).
- Served as a panelist for The Institute of Internal Auditors Philadelphia Chapter, Spring Conference, "The Yates Memo: What you and your audit committee need to know" – Philadelphia, PA (April 2016).
- Led presentation for The Institute of Internal Auditors Philadelphia Chapter, Spring Conference, "Latest Foreign Corrupt Practices Act (FCPA) developments" – Philadelphia, PA (April 2016).

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 24

- Presented "Corporate Compliance and Ethics Trends in Latin America" for a global Fortune 100 manufacturing company in Panama City, Panama (March 2015). (*)
- Presented "Fraud Awareness and COSO Framework Fraud Risk Assessment" for a leading clinical research organization in Raleigh, NC (December 2014).
- Led presentation for the RIMS Professional Exchange of Risk Knowledge (PERK) Program, Southwest Florida Chapter, "Supply Chain Risk and Your Insurance" – Naples, FL (September 2014).
- Led Code of Business Conduct and FCPA training course for a global Fortune 500 company in Semarang, Indonesia (October 2013). (*)
- Led Corporate Compliance Program training course for a French multinational in Port of Spain, Trinidad (July 2013). (*)
- Continuing Professional Education Seminar: "Latest Foreign Corrupt Practices Act Developments" – Jacksonville and Ft. Lauderdale, FL (June 2013).
- Participated on Americas Society/Council of the Americas roundtable discussion regarding Ethics & Compliance Challenges in Latin America – Brickell, FL (April 2013).
- Designed and conducted Continuing Professional Education training courses on Transaction Forensics and the FCPA – Miami, FL (March 2013).
- Led Code of Business Conduct and FCPA training course in Spanish for a global Fortune 500 company's third parties in San Luis Potosi, Mexico (February 2013). (*)
- Co-presented "Anti-Fraud Trends and Analytics – Integrating anti-bribery & corruption analytics into your compliance monitoring and assessment program" for a global Fortune company in Miami, FL (February 2013).
- Led Code of Business Conduct and FCPA training course for a global Fortune 500 company in Manila and Cebu, Philippines (November 2012). (*)
- Led Code of Business Conduct and FCPA training course in Bahasa Indonesia and English for a global Fortune company in Merak and Jakarta, Indonesia (June 2012). (*)
- Continuing Professional Education Seminar: "FCPA & U.K. Bribery Act Insights" – Jacksonville, FL (June 2012).
- Led FCPA Portuguese training course "Treinamento da Lei de Práticas de Corrupção no Exterior (FCPA) dos EUA" for a global Fortune 500 company in Campinas, Brazil and Miami, Florida USA (March 2012 and April 2012, respectively). (*)
- Led FCPA Spanish training course "Curso sobre la Ley Estadounidense de Prácticas Corruptas en el Extranjero" for a global Fortune 500 company in Salta, Argentina (November 2011). (*)
- Continuing Professional Education Seminar: "Fraud Analytics" – Hollywood, Tampa and Orlando, FL (May 2010).
- Designed and conducted internal Continuing Professional Education training courses on fraud and forensic accounting, forensic interviewing techniques, engagement management, and staff career development – Dallas, TX (November 2009).
- Continuing Professional Education Seminar: "Fraud and Forensic Accounting Concepts" – Ft. Lauderdale, Tampa and Orlando, FL (June 2009).
- Continuing Professional Education Seminar: "Fraud and Forensic Accounting" – Orlando, FL (June 2007).

(*) Denotes International Assignment



Nelson Luis, MBA, CFE, CFI, CFAA
Pg. 25

### Expert witness participation

- 29 May 2020 Court Order entered in *Kevin B. Sapp and Jaime Hopper v. Industrial Action Services, LLC and Reladyne, LLC*; United States District Court for the District of Delaware; Case No. 19-912-RGA (served as independent moderator)
- Served as the seller-side expert in a post-close dispute during a confidential JAMS arbitration in the State of New York, May 2018 (provided deposition testimony twice; testified at the hearing)
- 22 February 2017 Court Order entered in *Anthony Rufo v. Toni M. Varallo Rufo*; Media County, Pennsylvania; Case No. 2014-005135 (Pa. Ct. Comm. Pls.) (served as independent moderator at trial)
- *Michael Chow, et al. v. Chak Yam Chau, et al.*; United States District Court, Southern District of Florida; Case No. 09-21893-CIV-HOEVELER/GARBER (advised expert witness testify at deposition and trial)
- In the Matter of and Arbitration before the London Court of International Arbitration between Canadian Commercial Corp. and Comprehensive Care International, Inc., Claimants, and the Government of the Republic of Trinidad and Tobago, Respondent; LCIA Case No. 7978 (advised expert witness testify at arbitration hearing)
- *Rita Maria Sanchez de Hernandez, et al. v. Bank of Nova Scotia*; Supreme Court of the State of New York, County of New York; Case No. 610618/06 (advised expert witness testify at deposition)
- *Banco Espirito Santo International, Ltd., et al. v. BDO Seidman, LLP, et al.*; Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, FL; Case No. 04-14009 CA 31 (advised expert witness testify at deposition and trial)
- In the Matter of the Arbitration between World Omni Financial Corporation, et al., Claimants, and Ace Capital Re Overseas, Ltd., et al., Respondents. CPR Institute for Dispute Resolution; Case No. G-04-07 (advised expert witness testify at deposition and at the hearing)

(*) Denotes International Assignment

